# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **RONI L. MEDEARIS**. | § | |
| **TDCJ No. 1530043,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. A-12-CA-1102-FB** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Roni L. Medearis filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his September, 2008, Travis County convictions for aggravated sexual assault and burglary of a habitation with intent to commit sexual assault. For the reasons set forth hereinafter, the Court finds that petitioner is not entitled to federal habeas corpus relief or a Certificate of Appealability from this Court.

## I. Background

A.      The Offense

The uncontradicted testimony from petitioner's victim established (1) on the morning of August 14, 2005, she returned to the rental home in East Austin into which she had just moved and, as she entered the house, she observed a number of strange details, including a ball cap she did not recognize sitting on her sofa, the radio and television were both on, and a small pink bag she did not recognize also sitting on her sofa, (2) within seconds of her arrival, a shadow moving behind her caught her attention, (3) she turned to see the petitioner, completely naked and with all his body hair

shaven off, close and lock her front door behind her, (4) petitioner spoke to her, (5) she grabbed his scrotum and tried to hurt petitioner, (6) petitioner struck her hard in the face with the palm of his hand and she let of petitioner, (7) over the next several minutes, she fought hard with petitioner, repeatedly striking him while petitioner grabbed her hair and slammed her head against the floor, (8) petitioner's mouth began to bleed profusely when she slammed his face against a wall, (9) at one point she managed to push the petitioner off of her, (10) she and petitioner continued to struggle with petitioner pulling her head hard against her chest, (11) petitioner bit her on her forearm, (12) growing weary, she attempted to feign tears in an attempt to but time, (13) she tried unsuccessfully to hold on to a door frame but petitioner pulled her into the bedroom and directed her to remove her clothes, (14) she resigned herself to the inevitability she would be raped and followed petitioner's instructions, (15) petitioner asked for a condom and, when she said she did not have one, petitioner went to get one, (16) she attempted to rush past petitioner while he was distracted but petitioner grabbed her, (17) petitioner then said he was not going to wear a condom but she begged him to do so and he relented, (18) petitioner led her back to the bedroom where he put on a purple or blue condom and spoke crudely to her, (19) petitioner raped her vaginally, (20)  petitioner told her he wanted her to have an orgasm and she pretended to do so, (21) petitioner apparently did not ejaculate, (22) eventually, petitioner withdrew from her and tried to kiss her but she would not let him, (23) petitioner directed her to wash herself off in the bathroom, (24) she got into the bathtub, ran some water, and splashed it on herself in an effort to comply with petitioner's directive, (25) she was frightened petitioner would kill her and her primary concern was her own survival, (26) when she glanced at herself in the mirror, she had blood on her face and in her hair, (27) when petitioner commented that his DNA was everywhere, she offered to clean it up and began wiping the blood on

the walls with a green wash cloth or hand towel, (28) she also pulled the bloodstained sheets off her bed, (29) she got a band aid for a cut on petitioner's hand, (30) petitioner asked if they could do it again but she refused, (31) after she assured petitioner she would not call the police, petitioner put on his clothes and walked out the front door, (32) she locked the door behind her, grabbed a robe, and went down the street to a neighbor's where she tried to call her boyfriend, (33) after unsuccessfully attempting to reach her boyfriend by phone, she got on her bike and rode to his house a few blocks away but no one answered his door, and (34) she then went to a neighbor of her boyfriend where she obtained clothing and called her father, who instructed her to call the police.[1]

B.    Indictments

A Travis County grand jury indicted petitioner initially in cause no. D-1-DC-06-302558 on December 14, 2006 on two Counts charging petitioner with (1) burglary of a habitation with intent to commit sexual assault and (2) sexual assault.[2]  On July 18, 2008, a Travis County grand jury indicted petitioner in cause no. D-1-DC-08-904072 on two charges, to wit, burglary of a habitation with intent to commit sexual assault and aggravated sexual assault and included a pair of enhancement paragraphs alleging petitioner had previously been convicted of aggravated robbery and robbery.[3]  On August 29, 2008, a Travis county grand jury re-indicted petitioner on charges of

----

[1] Statement of Facts from petitioner's trial ("S.F. Trial"), Volume 4, testimony of Penny Scott, at pp. 35-58.  Petitioner's victim used the pseudonym "Penny Scott" throughout the criminal proceedings against petitioner.

[2] Transcript of pleadings. motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), at pp. 9-11.

[3] Trial Transcript, at pp. 82-84.

(1) aggravated sexual assault and (2) burglary of a habitation, and alleged in two enhancement paragraphs petitioner had previously been convicted of aggravated robbery and robbery.[4]

C.   Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's trial commenced September 9, 2008.  In addition to the victim's testimony summarized above, the jury heard testimony from (1) Penny Scott's neighbor who testified she was awakened on the morning of August 14, 2005 by a woman frantically sobbing and stating she had just been raped,[5] (2) the roommate of the petitioner's victim who testified the victim appeared to be distraught, upset, emotional, and shocked when she arrived at the home they had leased shortly after the assault and inside the home there was broken furniture and blood splatter on the walls of the front foyer,[6] (3) the Austin Police Officer who encountered Penny

---

[4] Trial Transcript, at pp. 167-69.
      More specifically, the final indictment charged petitioner with (1) on or about August 14, 2005 intentionally and knowingly causing the penetration of Penny Scott's sexual organ by petitioner's sexual organ without the consent of penny Scott by compelling Penny Scott to submit or participate by the use of physical force or violence; and petitioner did then and there by acts and words threaten to cause, or place Penny Scott in fear that serious bodily injury would be imminently inflicted on Penny Scott and said acts and words occurred in the presence of Penny Scott and (2) on or about August 14, 2005, petitioner intentionally and knowingly entered a habitation without the effective consent of Penny Scott, the owner thereof, with the intent to commit the offense of sexual assault.  The two enhancement paragraphs alleged (1) petitioner had been convicted January 30, 1988 of aggravated robbery in Travis County cause no. 80,762 and (2) petitioner has been convicted February 23, 1984 in Travis County cause no. 73561 of robbery.

[5] S.F. Trial, Volume 4, testimony of Maribel Rivero, at pp. 148-56.  Ms. Rivero also testified (1) she let the young woman into her house, (2) the woman was wearing only a robe, (3) the woman was crying a lot and said she had just moved into a nearby home, (4) the young woman asked to use her phone and tried to call her boyfriend but got no answer, (5) the young woman then left, and (6) when the police arrived about two hours later, she went out to speak with them.  *Id.*

[6] S.F. Trial, Volume 4, testimony of Amanda Dean, at pp. 157-75.  Mr. Dean also testified the kitchen window was broken and the blood on the walls had not been there the night before

Scott the morning of the assault who testified it was apparent to him something traumatic had happened to Penny Scott,[7] (4) the sexual assault nurse examiner who conducted the examination of petitioner's victim who testified she observed numerous physical injuries, including bruises, swelling, and scratches to the victim's forehead, mouth, neck, arms, elbows, a bite mark on her right wrist, and redness in the exterior lips of the victim's vagina and urethra,[8] (5) the Austin Police Detective who headed the investigation into Penny Scott's sexual assault who testified the crime scene was bloodier than some homicide scenes he had visited as a patrol officer,[9] (6) an Austin

---

when she had helped Penny Scott move into the house.  *Id.*

[7] S.F. Trial, Volume 4, testimony of Jeremy Compton, at pp. 176-208.  Officer Compton also testified (1) he drove Penny Scott back to the crime scene, (2) she had difficulty at times recounting the events of earlier that morning, choking up with disgust at one point as she "relived" the events she was recounting, (3) she described what she believed was a round tattoo on her assailant's forearm, (4) she recounted having been struck in the face and bitten on the arm by her attacker, (5) she recounted her attacker offered to use a condom if she would stop fighting him, and (6) when he later encountered Peny Scott again at the hospital where she was examined by a sexual assault nurse, Penny Scott appeared more angry than sad.  *Id.*

[8] S.F. Trial, Volume 5, testimony of Mary Levy, at pp. 6-30.  Nurse Levy also testified (1) she collected head and pubic hair and drew blood from the victim, (2) she collected vaginal swabs and labial swabs, and (3) it was not uncommon for sexual assault victims to display no acute vaginal trauma.  *Id.*

[9] S.F. Trial, Volume 5, testimony of Christopher Dunn, at pp. 30-127.  Detective Dunn also testified (10 this was the first case he worked after being assigned to the Austin Police Department's sex crimes division in which the victim did not know the identity of her attacker, (2) he had received no training in investigating sexual assault when he was assigned to the sex crimes division and had received none at the time he initially investigated Penny Scott's rape, (3) the crime scene was unusually bloody, (4) he found the presence of glass on the cement outside the broken kitchen window to be anomalous, (5) Penny Scott furnished information describing her attacker from which a composite drawing was made and a BOLO issued, (6) shortly after the assault, he showed Penny Scott a photo array which included a registered sex offender who resided near the crime scene but Penny Scott did not identify anyone in the array as her attacker, (7) he showed Penny Scott a second photo array a few days later which included an individual about whom the police had received information from a Crime Stopper's tip but Penny Scott again did not identify anyone in the array as her attacker, (8) Detective Dunn and another Austin

Police crime scene specialist who testified he photographed the crime scene and collected evidence,[10]

(7) Penny Scott's father who testified his daughter was hysterical when she called him immediately

─────────────────

Police Detective conducted a series of interviews of Penny Scott in which they attacked her account of her assault, lied to her about the results of the DNA analysis of the crime scene, and attempted to get her to change her account but she steadfastly refused to do so, (9) still later, he e-mailed Penny Scott's father a third photo array which included an individual named Kim Black Detective Dunn believed to be a very promising suspect, (10) when Penny Scott once again failed to identify anyone in the third array as her attacker, Detective Dunn insisted he needed her to identify Kim Black so Black could be arrested and a DNA sample obtained from Black, (11) only then did Penny Scott identify Kim Black as her attacker, (12) Kim Black was arrested but the DNA sdample taken from him did not match the blood found at the crime scene, (13) at that point, the investigation went cold until November, 2006 when the Texas Department of Criminal Justice sent Detective Dunn a notice of a "hit" on CODIS for petitioner's DNA, (14) Detective Dunn then showed Penny Scott a fourth photo array which included a photograph of petitioner for the first time and Penny Scott identified petitioner as her attacker. *Id.* On cross-examination, detective Dunn testified (1) there was blood on the walls on both sides of the foyer, (2) there was more blood in the foyer and in the kitchen than in the bedroom, which he found suspicious, (3) there was blood on the blinds next to the broken kitchen window, which he believed appeared to have been broken from the inside, (4) DNA tests showed the blood found in the front foyer, the kitchen window blinds, a leaf outside the kitchen window, a hand towel, the kitchen floor and sink, and the victim's clothing all came from the same individual, and (5) when he initially interviewed her, Penny Scott said there was nothing distinctive about her assailant. *Id.*, at pp. 88-122. When recalled by the prosecution, Detective Dunn testified (1) petitioner had gained some weight by the time of trial compared to the photograph in the photo array from which penny Scott identified petitioner as her attacker, (2) he obtained buccal swabs from Kim Black, Penny Scott's former boyfriend Will Wright, and petitioner, and (3) when petitioner's matched the DNA found at the crime scene, the investigation ceased. S.F. Trial, Volume 6, testimony of Christopher, Dunn, at pp. 6-15.

[10] S.F. Trial, Volume 5, testimony of James Bixler, at pp. 128-75. Mr. Bixler also testified (1) he photographed blood splatter on walls, kitchen cabinets, the front foyer of the house, clothing in the bedroom, in the living room and on a green towel, (2) it appeared that blood had been wiped off the kitchen floor, (3) he recovered no latent fingerprints at the crime scene, (4) he collected finger nail scrapings from Penny Scott at the hospital, (5) he also photographed the bite mark on Penny Scott's forearm, (6) he unsuccessfully attempted to lift a fingerprint off a condom wrapper and a fast-food restaurant receipt found at the crime scene, (7) there was glass found both inside and outside the house near the broken kitchen window, (8) he had received training in blood splatter analysis, (9) blood outside the kitchen window on concrete appeared to have dropped straight down at 90 degrees, and (10) blood found in the front foyer appeared to have been cast off hands as the hands moved at about a 45 degree angle. *Id.*

after her assault,[11] (8) a Travis County District Attorney's Office investigator who testified he personally received and photographed evidence, including the victim's bloody clothing, which had been erroneously released to the victim's family by Detective Dunn when the family returned same shortly before trial still sealed in the same containers in which it had been released,[12] (9) the head of the Austin Police Department's laboratory who testified about the DNA recovered from the crime scene and the comparative testing done on same, including the fact a pair of semen samples found on a pillow in the bedroom did not match petitioner's DNA,[13] (10) Penny Scott's mother who

---

[11] S.F. Trial, Volume 5, testimony of Ben Hackett, at pp. 197-217.  Mr. Hackett also testified (1) he is an attorney and former police officer, (2) Detective Dunn e-mailed him a photo array via computer, (3) when he handed his phone to his daughter she informed Detective Dunn "He's not here," (4) when Detective Dunn called his daughter's attention to Kim Black's photograph, she replied Black's shoulders or neck were wrong, (5) Detective Dunn then informed his daughter they needed to get the bad guy off the streets and only then did his daughter identify any of the men in the e-mailed photo array her attacker, and (6) Penny Scott's room mate Amanda Dean found a condom wrapper in the bedding on the floor of the bedroom where the sexual assault occurred which he took to Detective Dunn.  *Id.*

[12] S.F. Trial, Volume 6, testimony of Michael Henderson, at pp. 15-26.  Mr. Henderson also testified (1) petitioner's trial counsel was present when he opened and photographed the sealed evidence containers returned to Austin by the victim's family and (2) he took photographs of all of the petitioner's many tattoos.  *Id.*

[13] S.F. Trial, Volume 6, testimony of Cassie Carradine, at pp. 27-90.  Ms. Carradine also testified (1) initially the only DNA references her lab was given were Penny Scott and Kim Black, (2) Kim Black's DNA was not a match for any of the crime scene materials, (3) her lab was unable to get a good DNA profile off the green hand towel, which she attributed to the possible presence of bleach and other cleaning agents which can break down DNA and prevent its recovery, (4) initially the same unknown male was found to be the source of the blood found on the front foyer walls, the victim's tank top and jeans, and the kitchen blinds, (5) all of the foregoing DNA samples later matched petitioner's DNA with an extremely high degree of certainty, (6) it is not possible to determine the ethnicity or race of an individual from their DNA alone, (7) the pillow case found in the bedroom tested positive for both semen and blood, (8) the blood found on the bedroom pillow case matched petitioner's DNA but the semen did not match petitioner's DNA, and (9) the results from Penny Scoot's fingernail scrapings both showed mixtures of DNA and Penny Scott could not be excluded as a contributor to the scrapings taken from her right hand while petitioner could not be excluded as a possible contributor to the

testified there was blood smeared on the walls and floor of the house and it took three days to clean up all the blood,[14] and (11) Penny Scott's former boyfriend who testified he helped her move into the crime scene the night before the rape and found her face contorted and her hair matted when he arrived at the crime scene the following morning.[15]

After the prosecution rested, the defense rested without calling any witnesses.[16]  After deliberating less than three hours, the jury returned its verdict, finding petitioner guilty beyond a reasonable doubt on both charges against him.[17]

---

scrapings taken from Penny Scott's left hand.  *Id.*, at pp. 27-65.  On cross-examination, Ms. Carradine again testified that, while petitioner could be excluded as a possible source of the semen on the pillow case, petitioner could not be excluded as a possible source of the blood found on the same pillow case.  *Id.*, at pp. 66-90.

[14] S.F. Trial, Volume 5, testimony of Irene Hackett, at pp. 176-97.  Mrs. Hackett also testified (1) her daughter was sad, quiet, and appeared to be in pain when they met her at the hospital in Austin, (2) her daughter stayed with them in a hotel in the days immediately after the assault, (3) she spent three days packing her daughter's things and cleaning up the house, (4) there was a film of blood all over the kitchen floor, and on the hallway floor and hallway walls, (5) she also observed and cleaned blood on the baseboards in the hallway, the dog's bowl, on dishes, and in the bedroom on the comforter and on a book on a bed side table, and (6) when the Austin Police released her daughter's clothing and other evidence to the family, she kept the items in their sealed evidence containers in a closet at her home, never opened those containers, and later returned them to Austin still sealed.  *Id.*

[15] S.F. Trial, Volume 6, testimony of Michael Layne, at pp. 90-106.  Mr. Layne also testified he believed both of the blue pillow found in the bedroom at the crime scene were his and he had never been asked to furnish a DNA sample in connection with the case.  *Id.*, at pp. 100-02.

[16] S.F. Trial, Volume 6, at pp. 106-08, 113.

[17] S.F. Trial, Volume 6, at pp. 156-57; Trial Transcript, at pp. 192-201.  The trial record indicates petitioner's jury commenced its deliberations at approximately 2:25 PM and returned its verdict at approximately 5:15 PM on September 11, 2008.  Trial Transcript, at pp. 192-201.

D.    Punishment Phase

Petitioner chose to have the state trial court sentence him.[18]  The trial court then heard testimony from a fingerprint examiner who testified petitioner's fingerprints matched those on official courts documents showing petitioner had been convicted previously of forgery, robbery with bodily injury, and aggravated robbery with a deadly weapon.[19]  Penny Scott testified (1) she suffered tremendous emotional and psychological injury as a result of the petitioner's sexual assault upon her, (2) she received a lot of counseling, and (3) although she had married since the events of August 14, 2008, she continued to have issues with intimacy and often experienced high levels of anxiety.[20]  The trial judge found both of the enhancement paragraphs of the indictment against petitioner to be "true" and imposed concurrent sentences of sixty and seventy years on the burglary and aggravated sexual assault counts, respectively.[21]

E.    Direct Appeal

Petitioner appealed his conviction and sentence, filing his appellate brief on October 30, 2009.  As his point of error, petitioner argued his DNA had been seized in violation of his constitutional rights.  In an unpublished opinion issued June 23, 2010, the Texas Third Court of Appeals affirmed petitioner's conviction.  *Medearis v. State*, 03-08-00609-CR, 2010 WL 2540596 (Tex. App. – Austin June 23, 2010, *pet. ref'd*).  The Texas Court of Criminal Appeals refused petitioner's petition for discretionary review on December 15, 2010.

---

[18] S.F. Trial, Volume 4, at p. 5.

[19] S.F. Trial, Volume 6, testimony of Roger Dean, at pp. 160-76.

[20] S.F. Trial, Volume 6, testimony of Penny Scott, at pp. 176-84.

[21] S.F. Trial, Volume 6, at pp. 188-90.

F.    State Habeas Corpus Proceeding

Petitioner filed an application for state habeas corpus relief on September 26, 2011, asserting several claims for relief.[22]  The state trial court issued its findings of fact and conclusions of law addressing petitioner's state habeas corpus claims on July 18, 2012 in an order recommending petitioner's state habeas corpus application be denied.[23]  On August 8, 2012, the Texas Court of Criminal Appeals summarily dismissed petitioner's state habeas corpus application as "NONCOMPLIANT WITH TEX. R. APP. P. 73.1."  *Ex parte Roni Lewis Medearis aka Roni Medearis*, WR-77,985-01 (Tex. Crim. App. August 8, 2012).

_____

[22] Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), at pp. 28-39.  Petitioner's state habeas corpus application did not contain an original signature and was not verified or accompanied by an unsworn declaration as required Rule 73.1(d)(2) of the Texas Rules of Appellate Procedure.  While petitioner's state habeas corpus application was prepared on a standardized form, it was missing page 13 of 13 from that form.

Petitioner also filed a pro se memorandum of law in support of his state habeas corpus application.  *Id.*, at pp. 40-70.  As grounds for relief, petitioner argued in his state habeas corpus application and memorandum of law in support that his conviction should be vacated because (1) the semen stains on the pillow case did not match petitioner's DNA, (2) Detective Dunn manufactured evidence against petitioner by placing petitioner's photograph in the same position as Kim Black's photograph had been located in a prior photo array, (3) there was insufficient evidence to support to support petitioner's convictions, (4) the trial court erroneously refused to submit an instruction on the lesser-included offense of criminal trespass, (5) petitioner's rights under *Brady v. Maryland* when the prosecution withheld from the defense evidence showing petitioner's DNA did not match the semen found on the pillow case, (6) petitioner's blood was seized in violation of Articles 18.01 and 18.02 of the Texas Code of Criminal Procedure, and (7) petitioner's rights under Article 37.09 of the Texas Code of criminal procedure were violated by the admission of false evidence regarding the glass at the window break-in.  *Id.*

[23] The state trial court's order of July 18, 2012 appears as a separate document from petitioner's state habeas corpus transcript among the documents relating to petitioner's state habeas proceeding.

10

## II. **Proceedings in this Court**

Petitioner filed his pro se federal habeas corpus petition and memorandum in support of petition in this Court on November 8, 2012 (docket entry nos. 1 and 2), asserting his convictions should be set aside because (1) semen stains recovered from a pillow case in the bedroom did not match his DNA, (2) the prosecution introduced unspecified false evidence to secure his conviction, (3) the police employed an impermissibly suggestive show up procedure to secure his conviction, (4) the prosecution withheld exculpatory evidence (i.e., evidence the semen stains on the pillow case did not match petitioner's DNA) from the defense prior to trial, (5) there was insufficient evidence to support petitioner's convictions, (6) petitioner's blood was illegally seized while he was in state custody, and (7) petitioner's due process rights were violated by the improper joinder of his burglary and aggravated sexual assault charges in a single trial.

Respondent filed an answer on March 20, 2013 (docket entry no. 15) in which he argued petitioner has failed to exhaust available state remedies on petitioner's claims for federal habeas relief because petitioner's state habeas corpus application was dismissed on purely procedural grounds.

On April 1, 2013 and May 28, 2013 (docket entry nos. 16 and 19), petitioner filed pleadings in which he argued he had exhausted available state habeas remedies with regard to his claims in this federal habeas corpus proceeding and urged this Court to address the merits of his claims.

## III. **Standard of Review**

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918, 150 L. Ed. 2d 9 (2001).

11

Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438, 161 L. Ed. 2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 1519, 146 L. Ed. 2d 389 (2000); 28 U.S.C. § 2254(d).  Petitioner did exhaust available state remedies on direct appeal with regard to his complaint about the admission of DNA obtained through a blood sample from petitioner.  This claim is properly subject to review under the deferential standard set forth in the AEDPA.

As respondent correctly points out, however, petitioner's remaining claims for federal habeas corpus relief were either included in petitioner's state habeas corpus application (which the Texas Court of Criminal Appeals summarily dismissed on purely state procedural grounds) or, as in the case of petitioner's "misjoinder" claim, never presented to any state court.  These claims are currently unexhausted and, for that reason, petitioner's federal habeas corpus petition is properly subject to dismissal.  *See Rose v. Lundy*, 455 U.S. 509, 510, 102 S. Ct. 1198 1199, 71 L. Ed. 2d 379 (1982) ("Because a rule requiring exhaustion of all claims furthers the purposes underlying the habeas statute, we hold that a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court.").  Subsequent to the Supreme Court's opinion in *Rose v. Lundy*, the Supreme Court held there are circumstances in which a federal

court may address the merits of an unexhausted federal habeas corpus petition if the interests of comity and federalism will be better served by addressing the merits forthwith than by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim. *Granberry v. Greer*, 481 U.S. 129, 134, 107 S. Ct. 1671, 1675, 95 L. Ed. 2d 119 (1987). For example, "if it is perfectly clear that the applicant does not raise even a colorable federal claim, the interests of the petitioner, the warden, the state attorney general, the state courts, and the federal courts will all be well served even if the State fails to raise the exhaustion defense, the district court denies the habeas petition, and the court of appeals affirms the judgment of the district court forthwith." *Granberry v. Greer*, 481 U.S. at 135, 107 S. Ct. at 1675.

Consistent with the policy underlying the Supreme Court's opinion in *Granberry v. Greer*, when Congress enacted the AEDPA it which expressly authorized federal courts to deny relief on unexhausted claims. *Duncan v. Walker*, 533 U.S. 167, 183, 121 S. Ct. 2120, 2130, (2001) (recognizing the AEDPA gives a federal district court the alternative of simply denying a petition containing unexhausted but non-meritorious claims); 28 U.S.C. §2254(b)(2). Thus, this Court has the option of addressing the merits of petitioner's unexhausted claims if those claims appear to be non-meritorious. In such circumstances, this Court's review of the unexhausted claims is necessarily *de novo*. *See Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 452, 175 L. Ed. 2d 398 (2009) (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467, 162 L. Ed. 2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of

prejudice); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003) (holding the same).  For the reasons set forth below, this Court believes addressing the merits of petitioner's unexhausted claims in this cause is consistent with the policies expressed by the Supreme Court in  *Granberry v. Greer* and by Congress when it enacted the AEDPA.

## IV. <u>Insufficient Evidence</u>

In his memorandum in support of his federal habeas corpus petition, petitioner argues his conviction should be set aside because there was insufficient evidence to support the jury's verdicts, particularly in view of (1) the evidence showing the semen strains found on a bedroom pillow case did not match petitioner's DNA and (2) petitioner's argument that the presence of his blood smeared on the walls and floor of the residence where the crime occurred and in droplets outside the residence does not establish petitioner committed the charged offenses.  The United States Supreme Court has consistently applied a single standard for evaluating the sufficiency of the evidence to support a state criminal jury verdict.  "In *Jackson v. Virginia,* 443 U.S. 307, [324], 99 S. Ct. 2781, [2791-92], 61 I. Ed. 2d 560 (1979), we held that a state prisoner is entitled to habeas corpus relief if a federal judge finds that 'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.' " *McDaniel v. Brown*, 558 U.S. 120, 121, 130 S. Ct. 665, 666, 175 L. Ed. 2d 582 (2010) (*citation omitted)*.  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S. Ct. at 2789; *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.), *cert. denied*, 555 U.S. 995, 129 S. Ct. 496, 172 I. Ed. 2d 358 (2008).  To determine whether the evidence is sufficient to support a state

14

criminal conviction, the Court must look to state law for the substantive elements of the relevant criminal offense. *Jackson v. Virginia*, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16.

Applicable Texas law defines the offense of aggravated sexual assault as follows: A person commits an offense if the person intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without that person's consent. Section 22.021(a)(1)A)(i), TEX. PEN. CODE ANN. (Vernon 2011). Penny Scott testified she fought violently with petitioner, who slammed her head against the floor and bit her during their struggle until she realized she could not overpower or escape from petitioner and submitted to his demand for sexual intercourse.[24] The crime scene showed tangible evidence of a violent altercation, including bloody walls in the front foyer and hallway, blood on the floor outside the bedroom where the sexual assault occurred, and blood in many locations in the kitchen.[25] Viewed in the light most favorable to the jury's verdict, the uncontradicted testimony of Ms. Scott was sufficient to permit a rational juror to conclude the prosecution had proved the essential elements of the offense of aggravated sexual assault beyond a reasonable doubt.[26]

---

[24] S.F. Trial, Volume 4, testimony of Penny Scott, at pp. 45-53, 108, 115, 117-18. Penny Scott also testifi4ed she remained fearful for her life even after petitioner finished raping her and so she did her best to convince petitioner she would clean up the crime scene and not contact the police once he left. *Id.*, at pp. 53-56, 91-92, 122,

[25] S.F. Trial, Volume 4, testimony of Penny Scott, at pp. 73-82; Volume 4, testimony of Amanda Dean, at p. 161; Volume 5, testimony of James Bixler, at pp. 131-51, 171-74; Volume 5, testimony of Irene Hackett, at pp. 180-83, 191, 193-95. Detective Dunn described the crime scne as bloodier than many murder scenes he had visited as a patrol officer. S.F. Trial, Volume 5, testimony of Christopher Dunn, at pp. 40-41, 91-100. Crime scene specialist Bixler also testified it appears to him that blood had been cleaned or wiped from the kitchen floor. S.F. trial, Volume 5, testimony of James Bixler, at p. 131.

[26] *See* note 1, *supra*, and accompanying text.

Applicable Texas law defines the offense of burglary of a habitation as follows: A person commits an offense if, without the effective consent of the owner, the person enters a habitation then not open to the public with intent to commit a felony, theft or an assault.  Section 30.02(a)(1), TEX. PEN. CODE ANN. (Vernon 2011).   A rational juror could have concluded the uncontradicted testimony of Ms. Scott established beyond a reasonable doubt petitioner entered Penny Scott's rental home without her consent and petitioner did so with the intent to commit sexual assault.   As explained above, Penny Scott testified she unlocked her front door to enter her new rental home and entered, only to find the petitioner standing naked, with his body hair shaven off, behind her.[27] Petitioner immediately locked the front door behind her and fought violently with her when she resisted.[28]   Penny Scott testified without contradiction she did not have a condom.[29]   Petitioner produced a condom and thereafter forced her to have sexual intercourse.[30]   It was undisputed the kitchen window in the home was broken and blood was found on the blinds precisely where the window was broken, both on the blinds inside the window and on the cement just outside the window.  A rational jury could have rationally inferred from the foregoing uncontradicted testimony petitioner intended to commit sexual assault when he entered Penny Scott's home and had prepared to do so by shaving off his body hair, obtaining a condom, and taking off his clothing upon entering the home to lie in wait for her return.   Thus, a rational juror could have concluded (1) petitioner

---

[27] S.F. Trial, Volume 4, testimony of Penny Scott, at pp. 39-40, 45-46.  Penny Scott also testified her rapist's body hair was shaven off.  *Id.*, at p. 62.

[28] *Id.*, at pp. 40, 45-50, 110, 115.  Penny Scott also testified the petitioner told her he had seen her before and he enjoyed having the police chase him.  *Id.*, at pp. 91, 125.

[29] *Id.*, at p. 80.

[30] *Id.*, at pp. 49-52.

entered the home of Penny Scott when it was locked with the specific intention of committing sexual assault upon her and (2) the prosecution proved all the essential elements of the offense of burglary of a habitation beyond a reasonable doubt.

Petitioner's argument that semen stains found on a pillow in the bedroom did not match his DNA does not change the Court's insufficient evidence analysis.  As the state trial court noted in its factual findings in the course of petitioner's state habeas corpus proceeding, there was no evidence showing the semen in question could not have come from anyone other than the rapist.  In fact, Penny Scott's former boyfriend testified without contradiction the pillow in question probably was one he brought over to her former apartment and he often slept on his side with a pillow between his legs.[31]  Thus, the fact DNA from an unidentified third party also appeared at the crime scene was not exculpatory with regard to petitioner's offense.  What petitioner fails to note is that a pair of blood stains found on the same pillow did match petitioner's DNA.[32]

Viewed under the *Jackson v. Virginia* standard, there was ample evidence from which a rational jury could have concluded beyond a reasonable doubt petitioner was guilty of both aggravated sexual assault and burglary of a habitation with intent to commit sexual assault.  Even under *de novo* review, petitioner's insufficient evidence claims lack merit and are frivolous.

---

[31] S.F. Trial, Volume 6, testimony of Michael Layne, at pp. 99-102.

[32] S.F. Trial, Volume 6, testimony of Cassie Carradine, at pp. 56-58, 64.

## V. *Brady* Claim

Petitioner argues his rights under the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), were violated when the prosecution withheld from defense counsel evidence showing the semen stains found on a bedroom pillow case did not match petitioner's DNA. The Supreme Court has noted that few constitutional principles are more firmly established by Supreme Court precedent than the rule "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272, 157 L. Ed. 2d 1166 (2004); *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196-97. In this regard, the Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S. Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399, 49 L. Ed. 2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S. Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676, 685, 105 S. Ct. 3375, 3380 & 3385, 87 L. Ed. 2d 481 (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280-81, 119 S. Ct. at 1948; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 1568, 131 L. Ed. 2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281, 119

18

S. Ct. at 1948 (emphasis added); *Kyles v. Whitley*, 514 U.S. at 437, 115 S. Ct. at 1567.  Moreover, under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure.  *Banks v. Dretke*, 540 U.S. at 691, 124 S. Ct. at 1272; *Strickler v. Greene*, 527 U.S. at 281-82, 119 S. Ct. at 1948.  Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different.  *Banks v. Dretke*, 540 U.S. at 698-99, 124 S. Ct. at 1276.  The Supreme Court has further emphasized four aspects of the *Brady* materiality inquiry.  First, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal.  *See United States v. Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*).  Second, the materiality standard is *not* a sufficiency of the evidence test.  *Kyles v. Whitley*, 514 U.S. at 434-35, 115 S. Ct. at 1566.  Third, once materiality is established, harmless error analysis has no application.  *Kyles v. Whitley*, 514 U.S. at 435-36, 115 S. Ct. at 1566-67.  Finally, materiality must be assessed collectively, not item by item.  *Kyles v. Whitley*, 514 U.S. at 436-37, 115 S. Ct. at 1567.

Petitioner's complaint fails to satisfy any of the three prongs of *Brady* analysis outlined above.  First, petitioner alleges no specific facts showing the DNA evidence showing two semen stains found on the bedroom pillow did not match petitioner's DNA was withheld from petitioner's

trial counsel.  On the contrary, the prosecution's DNA testified at trial the two semen stains in question were found not to match petitioner's DNA.[33]  She also testified, however, two blood stains found on the same pillow did match petitioner's DNA.[34]  At no point did petitioner's trial counsel voice any surprise or take exception to this testimony.  On the contrary, petitioner's trial counsel emphasized this exact point during his cross-examination of the prosecution;'s DNA expert.[35] Second, petitioner fails to allege any facts showing the evidence indicating petitioner was not the source of the semen found on the pillow was favorable to petitioner.  As noted by the state habeas trial court, there was no evidence showing only the rapid has access to the pillow prior to the rape. Third, because there was blood on the pillow which did match the petitioner's DNA, the fact the semen found on the pillow did not match petitioner's DNA was not "material" within the meaning of *Brady*.  In point of fact, petitioner's jury was well aware the semen stains on the pillow did not match petitioner's DNA.  Given the undisputed fact the blood on the same pillow did match petitioner's DNA, and the fact the jury was informed the semen on the same pillow did not match petitioner's DNA, petitioner's complaint fails to satisfy the materiality prong of *Brady* analysis.

## VI. Impermissibly Suggestive Identification Procedures

Petitioner argues the identification procedures which resulted in Penny Scott identifying petitioner as her attacker were impermissibly suggestive because Detective Dunn placed petitioner's photograph in the fourth photo array shown to Ms. Scott in the same position as the photograph of Kim Black had been placed a year before when Detective Dunn cajoled a reluctant Ms. Scott into

---

[33] S.F. Trial, Volume 6, testimony of Cassie Carradine, at pp. 55-56.

[34] *Id.*, at pp. 56-59, 64.

[35] *Id.*, at pp. 82.

identifying Kim Black as her attacker.  When a witness identifies the defendant in a police-organized photo lineup, the identification should be suppressed only where the photographic identification procedure was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification.  *Perry v. New Hampshire*, ___ U.S. ___, ___, 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012); *Simmons v. United States*, 390 U.S. 377, 384-85, 88 S. Ct. 967, 971-72, 19 L. Ed. 2d 1247 (1968).  The Supreme Court has emphasized the Due Process test for the suppression of an eyewitness identification is implicated only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.  *Perry v. New Hampshire*, ___ U.S. at ___, 132 S. Ct. at 724; *Manson v. Braithwaite*, 432 U.S. 98, 107, 97 S. Ct. 2243, 2249, 53 L. Ed. 2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 381-82, 34 L. Ed. 2d 401 (1972). Even if this threshold requirement is satisfied, exclusion of a resulting identification is not necessarily mandatory.  *Perry v. New Hampshire*, ___ U.S. at ___, 132 S. Ct. at 724.  Rather, the second part of the Supreme Court test requires analysis on a case-by-case basis of whether improper police conduct created a "substantial likelihood of misidentification." *Perry v. New Hampshire*, ___ U.S. at ___, 132 S. Ct. at 724;  *Neil v. Biggers*, 409 U.S. at 199-201, 93 S. Ct. at 382-83.  Factors the Supreme Court has instructed courts to employ in making this evaluation include (1) the witness' opportunity to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.  *Perry v. New Hampshire*, ___ U.S. at ___, 132 S. Ct. at 725 n.5; *Manson v. Braithwaite*, 432 U.S. at 114, 97 S. Ct. at 2253; *Neil v. Biggers*, 409 U.S. at 199-200, 93 S. Ct. at 382-83.

In petitioner's case, Penny Scott (1) encountered a naked petitioner during daylight hours inside her home, (2) fought violently with petitioner for several minutes, (3) later submitted to rape by petitioner, (4) conversed with petitioner, (5) got a Band Aid for a cut on petitioner's palm, (6) smoked a cigarette, and (7) cleaned up some of the petitioner's blood, all before petitioner left the crime scene.  Thus, she had an exceptionally good opportunity to view petitioner.

Like the rape victim in *Neil v. Biggers*, Penny Scott gave an accurate description of petitioner's approximate age, height, overall physical appearance, including noticing a small round tattoo on one of petitioner's forearms.  Penny Scott testified, without contradiction, when she was shown the fourth photo array, she immediately recognized petitioner as her attacker and was one hundred percent certain of her identification.[36]  The fourth photo array was shown to Penny Scott in November, 2006 a little more than a year after the August, 2005 assault upon her and more than a year after she viewed an e-mailed photo array containing the photo of Kim Black, whom she initially refused to identify as her attacker.

Presuming for purposes of argument the placement of petitioner's photograph in the exact same position within a six-frame photo array as the photograph of Kim Black had appeared in a very different photo array a year before was "suggestive," this Court concludes, under the circumstances of the petitioner's case, there was no substantial likelihood of misidentification.  Petitioner's photograph was only shown to Penny Scott after petitioner's DNA was found to match the extensive blood spatter found at the crime scene.  The admission at petitioner's trial of Penny Scott's in-court identification of petitioner as her attacker did not violate petitioner's Due Process rights.

---

[36] S.F. Trial, Volume 4, testimony of Penny Scott, at p. 71.

## VII. "False Evidence" Claim

Petitioner also complains in cryptic terms the prosecution employed "false evidence" to secure petitioner's conviction.  Petitioner does not, however, offer any clear indication of precisely what false evidence was presented at his trial.  Nor does petitioner allege any specific facts showing the prosecution knowingly utilized false testimony or any other false evidence during petitioner's trial.

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959).  To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54, 92 S. Ct. at 766; *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).  Petitioner's conclusory assertion the prosecution employed unspecified false evidence to secure petitioner's conviction does not establish that petitioner can (1) identify specific false evidence, (2) demonstrate the evidence in question was factually inaccurate, (3) show there was a reasonable probability admission of the evidence in question affected the jury's verdict, or (4) demonstrate the prosecution knowingly utilized the false testimony or other false evidence during petitioner's trial.

23

## VIII. <u>Misjoinder Complaint</u>

Petitioner also challenges the fact that he was tried for both aggravated sexual assault and burglary of a habitation in the same trial court proceeding.  Petitioner does not identify any legal authority, under either state or federal law, making it improper for a criminal defendant to be tried for multiple offenses which arise out of the same nexus of operative facts.  Here, petitioner was tried for burglary of a habitation with intent to commit sexual assault and the ensuing aggravated sexual assault which resulted from the burglary in question, i.e., for two offenses arising out of the same operative facts.

Texas Penal Code Section 3.02(a) provides a defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode.  Texas Penal Code Section 3.03 provides a defendant convicted of multiple offenses arising out of the same criminal episode prosecuted in a single criminal action shall be sentenced for each offenses but, except for a few statutory exceptions, the sentences must run concurrently.  *Halliburton v. State*, 578 S.W. 2d 726, 739 (Tex. Crim. App. 1979) (the benefit afforded a criminal defendant by Section 3.03 is the trial court must treat separate offenses tried jointly as a single offense for sentencing purposes).  Texas Penal Code Section 3.04(a) provides whenever two or more offenses have been consolidated or joined for trial under Section 3.02, the defendant shall have a right to a severance of the offenses.  Texas Penal Code Section 3.04(b) provides further, however, a criminal defendant who invokes Section 3.04(a) to demand separate trials loses the benefit of Section 3.03 of the Texas Penal Code and may be subjected to consecutive sentences for the separate offenses tried separately.  *Werner v. State*, 412 S.W.3d 543, 547 (Tex. Crim. App. 2013) ("Although Section 3.04 was enacted for the

defendant's benefit, the risk he runs in requesting a severance is that the trial judge then has discretion to require consecutive sentences if the defendant is convicted in separate trials.").

Petitioner does not allege that he requested his trial counsel seek separate trials for the two felony charges brought against petitioner arising out of the events of August 14, 2005.  Had petitioner's trial counsel done so, under Section 3.04(a), petitioner would have been entitled to separate trials on those charges although petitioner would have faced the very real prospect he would receive consecutive, rather than concurrent, sentences if convicted of both offenses. Under such circumstances, petitioner has failed to allege any facts showing he was prejudiced by being tried jointly for both his offenses.  Moreover, petitioner's argument that he was tried without his objection for two separate offenses arising from the same criminal episode does not raise above the level of harmless error.  *See Brecht v. Abrahamson*,  507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993) (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"); *Simmons v. Epps*, 654 F.3d 526, 539 (5th Cir. 2011) (error is harmless under *Brecht* if the sentence would have been the same but for the constitutional error), *cert. denied*, ___ U.S. ___, 132 S. Ct. 2374, 182 L. Ed. 2d 1025 (2012).  Given the forensic evidence and eyewitness testimony establishing petitioner's guilt, there is no reasonable possibility petitioner's sentence would have been any less had he insisted upon separate trials on the two charges against him.

Petitioner does not identify any particular federal constitutional provisions guaranteeing him a right to retroactively demand separate trials after he failed to request same prior to the conclusion of his joint state trial.  Even presuming petitioner's rights under the Texas Penal Code were somehow violated by his joint trial on both burglary and aggravated sexual assault charges (which

petitioner has failed to establish), any violation of petitioner's state procedural rights, standing alone, would not entitle petitioner to federal habeas corpus relief.  Federal habeas corpus furnishes relief for violations of federal constitutional rights and federal statutory rights, not for violations of state procedural or evidentiary rules.  Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102, 111 L. Ed. 2d 606 (1990) (recognizing federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 874, 79 L. Ed. 2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).  In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court.  *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S. Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S. Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S. Ct. at 874.

## IX. Illegal Search and Seizure Claim

Petitioner argues the state appellate courts erroneously rejected his point of error on direct appeal arguing his blood was obtained as a result of an illegal search and seizure.  Under well-settled Supreme Court precedent, this Court may not grant federal habeas corpus relief premised upon an alleged violation of a state criminal defendant's Fourth Amendment right to remain free from unreasonable searches.  *See Stone v. Powell*, 428 U.S. 465, 494-95, 96 S. Ct. 3037, 3052 -53, 49 L. Ed. 2d 1067 (1976) ("where the State has provided an opportunity for full and fair litigation of a

Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.") (Footnote omitted); *Cobb v. Thaler*, 682 F.3d 364, 375 (5th Cir. 2012) ("Supreme Court precedent similarly forecloses federal habeas relief for state prisoners convicted on the basis of evidence obtained in an unconstitutional search and seizure."), *cert. denied*, ___ U.S. ___, 133 S. Ct. 933, 184 L. Ed. 2d 730 (2013).  Petitioner was afforded a full and fair opportunity during the course of his direct appeal to fully litigate his complaints about the allegedly illegal seizure of his blood.  Under the Supreme Court's holding in *Stone v. Powell*, petitioner's Fourth Amendment claim does not furnish a basis for federal habeas corpus relief.

## X. Certificate of Appealability

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA").  *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997) (holding the standard for obtaining a CoA is the same as for a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA.  *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).  Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts

requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); 28 U.S.C. §2253(c)(2).   Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000) (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).   In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S. Ct. 2562, 2569, 159 L. Ed. 2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S. Ct. 1595, 1603, 146 L. Ed. 2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S. Ct. 3383, 3394, 77 L. Ed. 2d 1090 (1983).   To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different

manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S. Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S. Ct. at 3394 n.4.  This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim.   "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S. Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604); *Tennard v. Dretke***,** 542 U.S. at 282, 124 S. Ct. at 2569.  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling.  *Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

Reasonable minds could not disagree over this Court's conclusions in Sections IV through IX above. Petitioner's conclusory false evidence and misjoinder claims fail to furnish an arguable basis for federal habeas corpus relief. Petitioner's *Brady* claim addressed evidence introduced by both parties at trial and is frivolous. Petitioner's claims of insufficient evidence are also frivolous. Petitioner's argument about his in-court identification by Penny Scott fails to acknowledge it was forensic (DNA) evidence tying petitioner to the crime scene which led to petitioner's conviction, not Ms. Scott's "one hundred percent" certainty as to petitioner's identity when she first saw the fourth photo array. Petitioner's illegal search and seizure claim is foreclosed by the Supreme Court's holding in *Stone v. Powell*. Petitioner's remaining claims are without merit or fail to rise above the level of harmless error. For these reasons, this Court finds that reasonable jurists could not disagree with this Court's conclusions on these issues.

IT IS THEREFORE ORDERED that all relief requested in petitioner's federal habeas corpus petition, filed November 8, 2012, docket entry no. 1, as supplemented by petitioner's memorandum in support of petition, filed November 8, 2012, docket entry no. 2, is DENIED.

IT IS FURTHER ORDERED that petitioner is DENIED a Certificate of Appealability on all issues herein.

IT IS FINALLY ORDERED that motions pending with the Court, if any, are DISMISSED as MOOT and this case is CLOSED.

It is so ORDERED.

SIGNED this 16th day of June, 2014.

_____

FRED BIERY
CHIEF UNITED STATES DISTRICT JUDGE